IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| CHARLES MURRAY. | ) |
| | ) |
|       Plaintiffs, | ) |
| | ) |
| vs. | )   Case No. |
| | ) |
| | )   Jury Trial Demanded |
| MANORCARE OF TOPEKA KS, LLC; | ) |
| HCR HEALTHCARE, LLC; HCR | ) |
| MANORCARE, INC.; and PROMEDICA | ) |
| HEALTH SYSTEM, INC. | ) |
| | ) |
|       Defendants. | ) |

## COMPLAINT

COMES NOW Plaintiff Charles Murray, individually, for his causes of action against the above-named defendants, states and alleges as follows:

## PLAINTIFFS

1. Plaintiff's Decedent, Lula Robertson, was a resident of Manorcare Health Services - Topeka located at 2515 SW Wanamaker Road Topeka, KS 66614, from approximately May 11, 2016 to August 28, 2018.

2. Lula Robertson died on August 30, 2018 from a choking incident at Manor Care Health Services – Topeka.

3. At the time of the choking incident on August 28, 2018, Lula Robertson required a mechanically soft diet.

4. Unfortunately, staff at the nursing home gave Ms. Robertson a piece of watermelon – inconsistent with a mechanically soft diet – after a hypoglycemic episode.

5. According to the EMS records: "transporting patient today in cardiac arrest. Code blue. Patient was in bed with staff doing CPR. Staff reported that patient had a blood sugar of 55mgdl and they where having her eat watermelon to help bring it up her blood sugar. Patient choked on it and went into cardiac arrest. They started CPR at that time and called 911. They had suctioned her mouth. I placed a 4 Igel and firefighters began bagging and doing CPR. Place etco2 on igel, attempted iv in left ac without success. i place a io in the left shoulder with ns wo, pushed d50. Moved patient to long spine board. once on the cot moved to ambulance. We had to remove the igel to suction the mouth as watermelon was coming up in the igel."

6. The Storemont Vail Hospital records state: "According to the history obtained from the The Storemont Vail Hospital Hospital chart, she was at her nursing home when she was found to be hypoglycemic earlier in the day. The staff gave her watermelon to increase her blood sugar and she choked on it. Soon after that, she lost pulse and CPR was initiated. . . . Per ER report, a significant amount of watermelon was sucked out from patient's upper and lower airway during intubation. She was intubated in the ER."

7. According to the medical records, Lula Robert's choking incident caused her to develop aspiration pneumonia that ultimately killed her.

8. Plaintiff Murray resides in Kansas, and is a surviving son and an heir-at-law of Lula Robertson within the meaning of K.S.A. § 60-1902.

2

## DEFENDANTS

## MANORCARE OF TOPEKA KS, LLC

9. Defendant Manorcare of Topeka KS, LLC, is a Delaware limited liability corporation.

10. At all times relevant to this action, Manorcare of Topeka KS, LLC owned, operated, and did business as Manorcare Health Services - Topeka, which is licensed by the State of Kansas as a skilled nursing facility.

11. Consequently, Manorcare of Topeka KS, LLC owed a duty to Lula Robertson to use reasonable care for her safety while under its care and supervision at the nursing home.

12. Manorcare of Topeka KS, LLC can be served through its registered agent, The Corporation Company, Inc., 112 SW 7th Street Suite 3C, Topeka, KS 66603

### HCR Healthcare, LLC

13. Defendant HCR Healthcare, LLC, is a Delaware limited liability company that at all times material hereto exercised operational and/or managerial control over Manorcare of Topeka KS, LLC.

14. At all times relevant, HCR Healthcare, LLC, and/or individuals or entities acting on its behalf owned, operated, managed, maintained, and/or controlled – in whole or in part – Manorcare of Topeka KS, LLC – which is a Kansas licensed nursing home.

15.     HCR Healthcare, LLC, was substantially engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the licensee, Manorcare of Topeka KS, LLC.

16.     Consequently, HCR Healthcare, LLC, owed a duty to Lula Robertson to use reasonable care for her safety while under its care and supervision at Manorcare of Topeka KS, LLC.

17.     Defendant HCR Healthcare, LLC, can be served through its registered agent, The Corporation Trust Company, Corporation Trust Center 1209 Orange St., Wilmington, De, 19801.

### HCR Manorcare, Inc.

18.     Defendant HCR Manorcare, Inc., is a Delaware company that at all times material hereto exercised operational and/or managerial control over Manorcare of Topeka KS, LLC.

19.     At all times relevant, HCR Manorcare, Inc, and/or individuals or entities acting on its behalf owned, operated, managed, maintained, and/or controlled – in whole or in part – Manorcare of Topeka KS, LLC – which is a Kansas licensed nursing home.

20.     HCR Manorcare, Inc, was substantially engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the licensee, Manorcare of Topeka KS, LLC.

4

21. Consequently, HCR Manorcare, Inc, owed a duty to Lula Robertson to use reasonable care for her safety while under its care and supervision at Manorcare of Topeka KS, LLC.

22. Defendant HCR Manorcare, Inc, can be served through its registered agent, The Corporation Trust Company, Corporation Trust Center 1209 Orange St., Wilmington, De, 19801.

### ProMedica Health System, Inc.

23. Defendant ProMedica Health System, Inc., is a Ohio non-profit company that at all times material hereto exercised operational and/or managerial control over Manorcare of Topeka KS, LLC.

24. At all times relevant, ProMedica Health System, Inc., and/or individuals or entities acting on its behalf owned, operated, managed, maintained, and/or controlled – in whole or in part – Manorcare of Topeka KS, LLC – which is a Kansas licensed nursing home.

25. ProMedica Health System, Inc., was substantially engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the licensee, Manorcare of Topeka KS, LLC.

26. Consequently, ProMedica Health System, Inc owed a duty to Lula Robertson to use reasonable care for her safety while under its care and supervision at Manorcare of Topeka KS, LLC.

27. Defendant ProMedica Health System, Inc., can be served through its registered agent, Jeffrey C. Kuhn, 100 Madison Ave., Toledo OH 43604.

## **DEFENDANTS' JOINT VENTURE**

28. Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows.

29. Defendants were engaged in a joint venture in that:

   a. Defendants had an agreement, express and/or implied, among the members of the group to operate Manorcare of Topeka KS, LLC which is a Kansas licensed nursing home;

   b. Defendants had a common purpose to operate Manorcare of Topeka KS, LLC which is a Kansas licensed nursing home;

   c. Defendants had a community of pecuniary interest in the operation of Manorcare of Topeka KS, LLC which is a Kansas licensed nursing home; and

   d. Defendants had an equal right to a voice in the direction of the operation of Manorcare of Topeka KS, LLC which is a Kansas licensed nursing home, which gave the Defendants an equal right of control.

30. There has been a close relationship between the Defendants at all times relevant.

## **JURISDICTION AND VENUE**

31. Plaintiff incorporates by reference all of the foregoing allegations in this Complaint as though fully set forth herein.

32. Defendants Manorcare of Topeka KS, LLC HCR Manorcare, Inc., and HCR Healthcare, LLC are Delaware corporations, while ProMedica Health System, Inc. is an Ohio company.

33. Therefore, Plaintiff Murray brings his claims contained in the Complaint under federal diversity jurisdiction, 28 U.S.C. § 1332(a)(1), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

34. Pursuant to K.S.A. § 60-308(b)(2), defendants Manorcare of Topeka KS, LLC; HCR Healthcare, LLC; HCR Manorcare, Inc.; and ProMedica Health System, Inc. purposefully availed themselves of the protections and/or benefits of the laws in Kansas by committing tortious acts within the state including, but not limited to, failing to ensure that Manorcare Health Services - Topeka had appropriate policies and procedures for its nursing staff, was properly capitalized, funded, staffed, and that staff received adequate training and supervision, thereby making jurisdiction proper in this Court.

35. A substantial part of the events or omissions giving rise to the claims described in the Complaint occurred in Kansas, thereby making venue proper in this Court.

## AGENCY

36. Plaintiff incorporates by reference the allegations previously set forth and further allege as follows.

37. The acts hereinafter described were performed by the agents, representatives, servants, and employees of defendants and were performed either with the full knowledge and consent of defendants, and/or were performed by their agents, representatives, servants, or employees during the scope of their agency, representation, or employment with the defendants.

38. Furthermore, the acts hereinafter described as being performed by the agents, representatives, servants, or employees of defendants were performed or were supposed to be performed on behalf of and/or for the benefit of Lula Robertson.

7

**Defendants' Management of Manorcare of Topeka KS, LLC**

39.     Plaintiff incorporates by reference the allegations previously set forth and further allege as follows.

40.     Defendants exercised substantial control over significant aspects of the operation and management of Manorcare of Topeka KS, LLC prior to and during Lula Robertson's period of residency therein, including but not limited to, the creation, setting, funding and/or implementation of budgets; creating and maintaining business relationships with related parties as defined by the Centers for Medicare and Medicaid Services that resulted in an undercapitalized and understaffed nursing home; the hiring and training of staff; the monitoring of resident acuity levels and staffing sufficiency to meet each resident's needs; control over resident admissions and discharge to and from the facility; and the creation and enforcement of written policies and procedures pertaining to the rules that provide for the safety and well-being of residents.

41.     Each of these managerial and operational functions had a direct impact on the quality of care delivered to Lula Robertson and other residents at Manorcare of Topeka KS, LLC and were taken in furtherance of an operational and managerial objective over the licensee Manorcare of Topeka KS, LLC.

42.     Defendants substantially derive their revenue and profits from the receipt of taxpayer dollars through federally and state funded Medicare and Medicaid programs.

43. Under Medicare, residents with higher acuity levels, i.e., a greater number and degree of illnesses, place higher demands for care and services on the nursing home and its staff.

44. The rate at which the skilled nursing facilities accepting Medicare dollars for the delivery of nursing home care and services, and accordingly the amount of their ultimate revenue and profits, are normally based upon the acuity level of the residents confined to their facilities.

45. Thus, Manorcare of Topeka KS, LLC had an incentive to maintain the highest possible occupancy and acuity level while minimizing patient care expenses, such as additional staff through the employment of enough RN's, LPN/LVNs, and CNAs.

46. That being said, Manorcare of Topeka KS, LLC still had an obligation to sufficiently staff its facility based not only upon the number of residents residing in the facility but also the residents' total acuity level.  Put simply, the more services residents need, i.e., the higher the total acuity level, the more staff that is required

47. Every resident in a skilled nursing facility – like Manorcare of Topeka KS, LLC – is assigned a Resource Utilization Group ("RUG") category regardless of payor status, i.e., private pay, Medicare, or Medicaid.

48. The Minimum Data Set ("MDS") generates each person's RUG category.

49. The MDS is a comprehensive nursing assessment that determines how much nursing help the resident needs and based on that analysis assigns a RUG category.

50. The facility then submits the MDS and RUG category for each resident to CMS.

51. The higher the RUG category the more help and nursing time the resident needs.

52. Put another way, RUG categories are like the rungs of a ladder.  People who need very little nursing care are slotted at the very bottom rungs of the ladder.  Towards the top of the ladder are the individuals that require the most nursing care.

53. CMS uses the number of residents for each RUG category in a nursing home to calculate its expected staffing level.

54. Indeed, CMS conducted a time study over a three-year period that determined the number of RN, LPN, and CNA minutes each RUG category required per day.

55. In other words, CMS has looked at all these RUG categories – or different rungs of the ladder – and determined how much time it takes to care for somebody at each one of those rungs.

56. In fact, CMS' expected staffing hours/minutes are calculated by adding the nursing time in minutes contained in the CMS Time Study for each resident's RUG category

57. Each RUG category requires a certain HPPD for registered nurses, licensed practical nurses, and aides.  This system applies to all residents, no matter their pay source.

58. CMS publishes these expected staffing numbers on the Internet for anyone to review at https://data.medicare.gov/data/archives/nursing-home-compare. More importantly, the technical users' guide for the 5-Star Rating System ***specifically directs the nursing home where to obtain its expected staffing data***:

> A downloadable file that contains the "expected", "reported" and case-mix adjusted hours used in the staffing calculations is available at: http://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/FSQRS.html. The file, referred to as the "Expected and Adjusted Staff Time Values Data Set", contains data for both RNs and total staff for each individual nursing home.

59. Here, defendants engaged in a systematic process of ensuring Manorcare of Topeka KS, LLC maintained the highest occupancy and acuity rate possible while providing insufficient staff to meet the individual needs of Lula Robertson during her period of residency therein.

60. The data submitted by Manorcare of Topeka KS, LLC through CMS' payroll based journal ("PBJ") system shows that it provided far less direct care nursing staff then CMS expected.

61. Specifically, throughout 2018, defendants failed to ensure, through their operational, budgetary, consultation and managerial decisions and actions, that Manorcare of Topeka KS, LLC was sufficiently staffed to meet the individual needs of Lula Robertson during her period of residency therein.

62. In addition, throughout 2018, defendants failed to ensure, through their operational, budgetary, consultation and managerial decisions and actions, that Manorcare of Topeka KS, LLC was sufficiently capitalized to meet the individual needs of Lula Robertson during her period of residency therein.

63. In other words, defendants' actions throughout 2018 resulted in an undercapitalized and understaffed nursing home during Lula Robertson's residency.

64. Upon information and belief, while holding Manorcare of Topeka KS, LLC out to Lula Robertson and other members of the public as providing excellent care, defendants and their related entities, as reflected on the facility's 2018 Medicare and Medicaid Cost Reports – signed under penalty of perjury and filed with the state of Kansas and the federal government – extracted considerable profit through the management and operation of Manorcare of Topeka KS, LLC by paying management, administration and consulting fees, as well as other "costs," to the defendants named herein and other related entities from funds which should have been utilized to hire, train and retain sufficient numbers of qualified staff to meet the needs of Lula Robertson.

65. Specifically, upon information and belief defendants engaged in transactions with each other, i.e., "related parties" as defined by the Centers for Medicare Services at dollar amounts far exceeding fair market value and in contradiction of "prudent buyer" principles.

66. Upon information and belief, these payments made by the nursing home to other defendants throughout 2018 constituted funds that could and should have been utilized to hire, train and retain sufficient numbers of qualified staff to meet the needs of Lula Robertson.

67. This undercapitalization and lack of sufficient staff directly resulted in Lula Robertson not receiving the very basic and necessary services to prevent, among other things, neglect and abuse leading to her choking and her death.

68. In accepting and utilizing taxpayer dollars through Medicaid and Medicare reimbursement in the provision of nursing home care and related services provided to Lula Robertson and other residents, Defendants undertook a duty and were obligated to comply with the federal Nursing Home Reform Act of 1987 a/k/a the Omnibus Budget Reconciliation Act of 1987 (OBRA '87) signed into law by President Ronald Reagan, and provide care and services that met the prevailing standard of care in the delivery of all care and services provided to Lula Robertson while she resided within the nursing home known as Manorcare of Topeka KS, LLC.

## COUNT I

### Plaintiff Murray's Wrongful Death Claim Against Defendants

69. Plaintiff incorporate by reference all of the foregoing allegations in this Complaint as though fully set forth herein.

70. As a result of her defenseless and dependent condition, Lula Robertson relied upon defendants to provide for her safety, protection, care and treatment.

71. At all relevant times, defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing facility.

72. These duties required defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Lula Robertson.

73.     These duties required defendants to have sufficient and qualified staff at Manorcare of Topeka KS, LLC nursing home to ensure the proper care for, and treatment of all residents including Lula Robertson.

74.     These duties required defendants to ensure that Manorcare of Topeka KS, LLC's nurses and other staff were properly educated and trained with regard to the care for, and treatment of all residents including Lula Robertson.

75.     These duties required defendants to ensure that Manorcare of Topeka KS, LLC was properly capitalized to ensure the proper care for, and treatment of all residents including Lula Robertson

76.     Specifically, during the course of their care and treatment of Lula Robertson, defendants and their agents, servants and/or employees breached their duty and were guilty of the following acts of negligence and carelessness by failing to measure up to the requisite standard of due care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including:

   a. By failing to adequately assess, monitor, document, treat, and respond to Lula's physical condition, including her risk of choking;

   b. By failing to enact and carry out an adequate care plan – interim or otherwise – in regard to Lula's risk for choking;

   c. By failing to prevent Lula from choking;

   d. By failing to appropriately supervise Lula while she ate;

   e. By failing to appropriately evaluate Lula's chewing/swallowing ability;

   f. By failing to provide Lula a mechanically soft diet;

   g. By failing to provide adequate staff to ensure Lula's 24-hour protective oversight, supervision and care;

14

h. By failing to properly supervise and train the employees, agents and/or servants of defendants who were responsible for the care and treatment of Lula;

i. By failing to have and/or implement appropriate policies and procedures regarding the prevention, assessment and treatment of for a resident's risk of choking;

j. By failing to have appropriate dietary guidelines and/or policies and procedures regarding a mechanically soft diet;

k. By failing to have a sufficient number of staff; and

l. By failing to ensure the nursing home was properly capitalized.

77. The wrongful acts of defendants directly caused or directly contributed to cause the death of Lula Robertson.

78. As a direct and proximate consequence of the death of Lula Robertson, Plaintiff Murray has sustained pecuniary and non-pecuniary damages, including, but not limited to, mental anguish, suffering and bereavement; loss of companionship; loss of services, loss of attention and loss of a complete family; loss of familial care, advice, and protection.

WHEREFORE, Plaintiff Murray prays that the Court enter judgment against defendants for a reasonable sum of money in excess of seventy-five thousand dollars ($75,000) for damages in order to fairly compensate for the losses suffered.

## COUNT II

### Alter Ego Against Defendants HCR Healthcare, LLC; HCR Manorcare, Inc. and ProMedica Health System, Inc. ("Alter Ego Defendants")

79. Plaintiff incorporates by reference all of the foregoing allegations in this Petition as though fully set forth herein.

80. Manorcare of Topeka KS, LLC is so dominated by the Alter Ego Defendants that Manorcare of Topeka KS, LLC is a mere instrument of Alter Ego Defendants and are indistinct from Alter Ego Defendants.

81. In fact, Manorcare of Topeka KS, LLC is so controlled and influenced by the Alter Ego Defendants in that they exercised complete control and domination over Manorcare of Topeka KS, LLC finances and business practices.

82. Specifically, the Alter Ego Defendants complete control and domination over Manorcare of Topeka KS, LLC caused its undercapitalization and understaffing during 2018 and George's residency.

83. Upon information and belief, the Alter Ego Defendants complete control and domination over Manorcare of Topeka KS, LLC caused it to operate at a loss during the year of 2018.

84. Upon information and belief, the Alter Ego Defendants complete control and domination over Manorcare of Topeka KS, LLC caused its liabilities to exceed its assets during the year of 2018. Specifically,

   a. The Alter Ego Defendants own all or most of the capital stock of the Manorcare of Topeka KS, LLC;

   b. The Alter Ego Defendants and the Manorcare of Topeka KS, LLC have common directors or officers;

   c. The Alter Ego Defendants finance Manorcare of Topeka KS, LLC;

   d. The Alter Ego Defendants subscribe to all of the capital stock of the Manorcare of Topeka KS, LLC;

   e. The Alter Ego Defendants caused the incorporation of Manorcare of Topeka KS, LLC;

   f. Manorcare of Topeka KS, LLC has grossly inadequate capital;

g. The Alter Ego Defendants pays the losses of Manorcare of Topeka KS, LLC;

h. The Alter Ego Defendants use the property of the Manorcare of Topeka KS, LLC as its own; and

i. The directors or executives of Manorcare of Topeka KS, LLC do not act independently in the interest of Manorcare of Topeka KS, LLC but take their orders from the Alter Ego Defendants in the latter's interest.

85. Thus, the Alter Ego Defendants used the corporate cloak of the Manorcare of Topeka KS, LLC as a subterfuge to defeat public convenience, to justify a wrong, and/or to perpetrate a fraud in that the Alter Ego Defendants complete control and domination of the Manorcare of Topeka KS, LLC depleted all of Manorcare of Topeka KS, LLC's assets, thereby making it unable to pay a judgment resulting from its care of residents including Lula Robertson.

86. This undercapitalization and understaffing violated Manorcare of Topeka KS, LLC's duties and the applicable standard of care owed by a nursing home operator or manager to the facility's residents.

87. As a direct and proximate result of the individual and collective acts of negligence of Manorcare of Topeka KS, LLC – and the Alter Ego Defendants – Lula Robertson suffered severe pain, anxiety, mental distress, and death.

88. As a direct and proximate result of the individual and collective acts of negligence of Manorcare of Topeka KS, LLC – and the Alter Ego Defendants – Plaintiff, suffered damages including, but not limited to, loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement and mental anguish.

89. The actions of the Manorcare of Topeka KS, LLC – and the Alter Ego Defendants – were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Lula Robertson and others, such that, in addition to damages for pain and suffering, defendants are liable for aggravating circumstances damages for their grossly negligent care of Lula Robertson.

90. At the time Manorcare of Topeka KS, LLC – and the Alter Ego Defendants – caused and allowed Lula Robertson to choke on watermelon, they knew that their conscious disregard to provide adequate staff and properly capitalize Manorcare of Topeka KS, LLC during 2018 high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Lula Robertson.

91. Accordingly, Manorcare of Topeka KS, LLC – and the Alter Ego Defendants – showed a complete indifference to, or conscious disregard, for the safety of others, including Lula Robertson and warrants aggravating circumstances damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.

92. As a direct and proximate result of Manorcare of Topeka KS, LLC – and the Alter Ego Defendants – negligence, and complete indifference to, or conscious disregard, for the safety of others, including Lula Robertson, Lula Robertson was harmed and suffered damages, including but not limited to pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; death; and other damages.

WHEREFORE, Plaintiff prays that the Court enter judgment against defendants for a reasonable sum of money in excess of seventy-five thousand dollars ($75,000) for actual and punitive damages together with the costs and expenses herein occurred, attorneys' fees and for such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff request a jury trial on all issues in this action in Kansas City.

Respectfully submitted,

THE STEELE LAW FIRM

/s/ Jonathan Steele
Jonathan Steele          KS # 24852
2345 Grand Blvd., Suite 750
Kansas City, MO 64108
Telephone: 816.754.6473
E-mail: jonathan@jsteelelawfirm.com

*Attorney for Plaintiff*