# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

CHARLES MURRAY, Individually )
and as Special Administrator of the )
ESTATE OF LULA ROBERTSON, )
 )
       Plaintiffs, )
  vs. )   Case No. 19-2148-HLT-KGG
 )
MANORCARE OF TOPEKA KS, )
LLC, *et al.*, )
 )
       Defendants. )
_____)

## MEMORANDUM & ORDER ON
## MOTION TO COMPEL OR STRIKE AND
## <u>MOTION TO SUPPLEMENT EXPERT REPORT</u>

Charles Murray, acting for himself and the Estate of Lula Robertson, alleges Robertson died on August 28, 2018 because Defendants[1] failed to adequate staff their Topeka, Kansas nursing home. Plaintiffs have identified two experts to provide support for their understaffing claim, Valerie Gray and Dr. Kathleen Hill-O'Neil.

---

[1] Defendants are three Delaware limited liability companies (Manorcare of Topeka KS, HCR Healthcare, and HCR Manorcare) and one Ohio corporation (ProMedia Health System) which, the Plaintiffs allege, owned or operated the nursing home.

1

Seeking to obtain additional information[2] about how the experts came to their opinions, Defendants have moved (Doc. 137) to compel the production of documents used by Gray and Hill-O'Neill. Alternatively, Defendants seek to strike Gray and Hill-O'Neal as witnesses. Plaintiffs have also moved to supplement Ms. Gray's expert report. (Doc. 151.) Having reviewed the submissions of the parties, and as discussed herein, Defendants' motion to compel or strike (Doc. 136) is **GRANTED** as to the request to compel and **DENIED without prejudice** as to the request to strike. Plaintiffs' motion to supplement (Doc. 151) is **GRANTED**.

**1.    Motion to Compel or Strike (Doc. 136).**

Plaintiffs allege that Defendants violated minimal standards for staffing, citing 42 CFR §483.35, which provides that a facility

> must have sufficient nursing staff with the appropriate competencies and skills sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care and considering the number, acuity and diagnoses of the facility's resident population in accordance with the facility assessment required at § 483.70(e).

---

[2] Specifically, Defendants seek (1) the nationwide database which Gray used for her calculations, (2) the method (by programs, codes, coding, formulas, or processes) she used to distill, sort, organize or import this data into an intermediate selection relating to the Topeka nursing home, (3) the process she used to impute daily acuity needs for individual residents, and (4) the process she used to create her Time Study staffing level calculation. (Doc. 137, at 20-22.)

2

In the present motion, Defendants allege that the information which was supplied by Plaintiffs failed to meet the requirements of Fed.R.Civ.P. 26(a)(2)(B). Gray was designated to testify as an expert "regarding calculations she conducted regarding nursing home staffing levels as described in her report," (Doc. 122, at 4.) She was also designated as a summary witness pursuant to Fed.R.Evid. 1006.[3] (Doc. 123.) Plaintiffs submitted Gray's two expert reports. (Docs. 122-11 and 123-2.) Plaintiffs also designated Hill-O'Neill as a retained expert and included her expert report. (Doc. 122-3.)

Much of Hill-O'Neill's opinions on the allegedly deficient staffing at the nursing home derive from Gray's computer review of publicly available information published by the Centers for Medicare & Medicaid Services (CMS). She concludes that the CMS data shows a mismatch between the required level of

---

[3] That Rule provides, in relevant part, that

> [t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Fed.R.Evid. 1006. While the underlying materials forming the basis of the summary need not be admitted into evidence, the admission of such summaries is conditioned on the evidence forming the basis of the summaries being admissible. *U.S. v. Samaniego*, 187 F.3d 1222, 1223 (10th Cir. 1999) (citing **Harris Mkt. Research v. Marshall Mktg. & Communications Inc.**, 948 F.2d 1518, 1525 (10th Cir. 1991)).

3

staffing and the actual staffing of the Topeka nursing home. The former was determined by the Minimum Data Set (MDS) information submitted by nursing homes to CMS, which includes a Resource Utilization Group (RUG) category, identifying the amount of care needed by an individual patient. The latter was determined by reference to payroll based journal (PBJ) information submitted to CMS.

For Hill-O'Neill the acuity – required level of staffing — is primarily determined by a resident's RUG category as shown in her MDS.

> The MDS is an assessment done by the nursing home at regular intervals for every resident in a Medicare or Medicaid certified nursing home. Information is collected about the president's health, physical functioning, mental status, and general well-being. These data points are used by the nursing home to assess each resident's needs and develop a plan of care. The MDS also assigns a Resource Utilization Group ("RUG") category for each resident regardless of payor status, i.e., private pay, Medicare, or Medicaid.
>
> The facility then submits the MDS and RUG category for each resident to CMS [Centers for Medicare & Medicaid Services]. The higher the RUG category the more help and nursing time the resident needs. Put another way, RUG categories are like the rungs of a ladder. People who need very little nursing care are slotted at the very bottom rungs of the ladder. Towards the top of the ladder are the individuals that require the most nursing care.

(Report, at 5.)  She explained her methodology as a sequential process:

The **first step** is to determine the collective resident acuity and care needs using resident's RUG scores contained in his or her minimum data set (MDS).

The **second step** is to determine the actual nurse staffing levels for RNs, LPNs, and CNAs. This step involves analyzing data from facility internal staffing reports and payroll data, and payroll-based journal (PBJ) data submitted to CMS beginning in 2017.

The **third step** is to determine appropriate nurse staffing levels based on resident acuity using the CMS STM.

The 1995 to 1997 STM study determined the amount of nursing time for each RUG group. The STM included data on 3,933 Medicare, Medicaid, and self-pay residents in 150 Medicare-certified SNF units in 12 States (Kansas, Maine, Mississippi, Ohio, South Dakota, Texas, Washington, California, Florida, Maryland, Colorado, and New York). Medicare residents were 34% of the sample. Nursing staff used electronic wands over a period of 48 hours to record episodes of direct resident care lasting 30 seconds or more. Nonresident-specific nursing time (such as meetings, administration, breaks, and unit residents.

Harrington C, Dellefield ME, Halifax E, et al. Appropriate nurse staffing levels for U.S. nursing homes. Health Serv Insights 2020 June 29 EEpub ahead of print]. doi: 10.1177/1178632920934785.

The CMS STM was also used by the CMS Medicare Nursing Home Compare website for determining expected staffing levels based on the RUG scores from 2009 through March 31, 2018. *Id*. The necessary nurse staffing minutes for each RUG category was published in Appendix, Table A1 of the *Design for Nursing Home Compare* Five-Star Quality Rating System: Technical Users' Guide.

5

*Id*. at 6.  According to Hill-O'Neil, each day a nursing home should compute a RUG score for each resident, determine that average nursing time required for each rug, and determine the actual level of staff required.  *Id*. at 7.

In her report, Hill-O'Neill identifies the materials she "considered in developing [her] opinions," including that the "Expert Designation of Valerie J. Gray and her complete file."  (*Id*., at 2.)  She writes:

> I have further reviewed the staffing needs as described in Valerie Gray's expert report [ ] containing RUG scores for each resident for the month of August 2018 – and August 28, 2018 specifically – and the comparison of that calculation to the PBJ dated for that month and day.  Valerie Gray's calculation of the number of nursing minutes HPPD required for each resident in the facility based upon the CMS STM is data ordinarily used in the nursing home and is treated as described above … Based on my independent analysis that the above-described materials – along with Valerie Gray's calculations – it is my opinion that Manor Care of Topeka failed to provide sufficient staff to meet the needs of its residents in August 2018 and August 28, 2018, specifically.

(*Id*., at 8).  By footnote, Hill-O'Neill states that she is

> familiar with the methodology utilized by Ms. Gray to calculate actual /reported staffing numbers vs. the CMS STM estimates and cost discrepancies between those numbers and **I have reviewed the underlying data relied upon by Ms. Gray**. … Ms. Gray used Microsoft Excel to place all of the data in a spreadsheet format and utilized that application's ability to write mathematical equations into the Excel cells to perform the mathematical comparisons between the numbers.  Upon comparison between the Excel spreadsheets and the

>source documents, I determine that the data was entered correctly and the calculations were performed correctly.

(*Id*., at 8 (emphasis added).)  Hill-O'Neill's report continues that she "further reviewed Valerie Gray's calculations containing the PBJ data for Manor Care of Topeka for the time period June 1, 2016 through November 30, 2018, compared to the staffing needs of the Facility based upon the RUG scores for each resident … ." (*Id*., at 9.)

Defendant contends that "[o]ther than the reports of Gray and Hill-O'Neill, Plaintiffs did not provide the underlying facts or data on which these expert witnesses relied in forming their opinions, or which was considered by them." (Doc. 137, at 4.)  By letter dated February 1, 2021, defense counsel provided Plaintiff's counsel with a list of requested information and documents relating to Gray and Hill-O'Neill's reports and opinions.  (*Id*., at 4-6.)  Counsel for the parties continued to communicate for the next month regarding these issues, during which time Plaintiffs produced additional documents, though not everything sought by Defendants.  (*Id*., at 6-16.)

Plaintiffs contend that no additional information is required, arguing that the CMS information used in Gray's calculations was ultimately derived from Manorcare's own information which it submitted to the government, and thus "the data defendants claim they need to analyze and verify *is their own data* that they generated and possess."  (Doc. 147, at 2 (emphasis in original).)  They further

7

argue that any questions Defendants may have about how the experts calculated the required and actual staffing levels may be asking during their depositions, and that the information which the defense did supply (in the form of native CSV input and Excel output related to the SQL database from the CMS data) was sufficient under Rule 26.  In particular, Plaintiffs rely on **Sibley v. Sprint Nextel Corp.**, No. 08-2063-KHV, 2012 WL 13027064, at *2 (D. Kan. Dec. 13, 2012), in which — Plaintiffs assert — Judge O'Hara "held that Rule 26 does not require the production of information sufficient 'to replicate the expert's analysis.'" (Doc. 146, at 6.)

    The Court grants the Defendants' motion.  **Sibley** in fact supports further disclosure in the present action.  The "replication" language cited by Plaintiffs occurs in a footnote in which the court rejected the *defendants' gloss* on the test for production the court was adopting.  **Sibley**, 2012 WL 13027064, at *2 n. 16.

> With Thornton's expert report, defendants also produced five computer hard drives containing 8.62 terabytes of data, including the computer programs that Thornton used to process the Stage 3 data. But neither Thornton nor defendants provided an overview of the data—such as how the programs work or in what order Thornton ran them.
>
> Even taking the October 2012 report and the data files together, the undersigned finds that they provided an inadequate disclosure of the reasons behind Thornton's opinions. The purpose of Rule 26(a)(2)'s expert disclosure requirements is to eliminate surprise and provide the opposing party with enough information

> regarding the expert's opinions and *methodology* to prepare efficiently for deposition, any pretrial motions, and trial. Thornton's expert report failed to meet this test, as it contained no explanation at all about the process or methodology she applied in analyzing the Stage 3 data.

*Id*. at 2 (emphasis in original, footnotes and internal quotation omitted).

This is true here as well. In the final expert reports of Gray and Hill-O'Neill, Plaintiffs have supplied general information about how those experts reached their conclusions, but have not supplied information which would allow for meaningful cross-examination of those experts about how the CMS data was processed or coded so as to yield the results in the final report. The **Sibley** court found that the initial production was deficient, but denied the plaintiff's motion to strike because the defendants subsequently produced additional information ins which the expert explained "how the data and programs provided with her report could be run 'to trace the programming path used at each step of my analysis.'" *Id*.

Rule 26(a)(2)(B) provides:

> *Witnesses Who Must Provide a Written Report.* Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report – prepared and signed by the witness – if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report **must contain**:
>
>> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;

> (ii) **the facts or data considered by the witness in forming them**;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

(Emphasis added.)  The requirements of this Rule are "mandatory as to retained experts."  ***Thummel v. PSI Transport, LLC***, 2018 WL 2198650, at 82 (D. Kan. May 14, 2018) (citation omitted).

Plaintiffs have not produced all the "facts or data" relied upon by Gray and O'Neill, but Excel spreadsheets which do not show how the original CMS data was sorted, organized, or imported.  Plaintiffs acknowledge that their experts used the SQL database to "sort[] and organiz[e] the native/imported data."  (Doc. 146, at 6).  This is not, as Plaintiffs complain, an attempt to "replicate" Gray's procedures.  Rule 26 requires a party to produce that data relied upon by an expert, with an explanation of the expert's methodology sufficient to allow the opposing party to prepare efficiently for deposition."  ***Sibley***, at *2.

Plaintiffs' contention that further production is unnecessary because it is Manorcare's "own data" is incorrect.  The information contained in Gray and Hill-

O'Neill's final reports reflects their attempt to reproduce, indirectly, what Manorcare reported (or which Plaintiffs believe it should have reported) to CMS. Gray took national MDS data which had been downloaded to Gray's employer Everest Litigation (Doc. 122-11, ¶ 23) and then coded, calculated, or sorted that data into an end result which allegedly reflects Manorcare's daily MDS and RUG information.  But there has been no production of the original national data, or information as the coding, calculation, and sorting, all of which is "data" for purposes of Rule 26.  Further, Defendants contend that Manorcare does not (and is not required to) calculate *daily* RUG scores for residents.  The materials which were produced and were reviewed by the Court suggest that the daily RUG scores which were produced reflect values which were somehow imputed or calculated by Gray.

Plaintiffs contend that production of  be all MDS assessments would be unduly burdensome.  (Doc. 146, at 18.)  But these assessments were accessed and used by Gray for her Report, and Hill-O'Neill explicitly states that she relied on Gray's report and her underlying documentation.  Access to the material was stored electronically, which will diminish the burden of production.  If the materials were not too burdensome to obtain, they will not be too burdensome to produce.

The Court accordingly **GRANTS** the motion to compel the information identified by Defendants.[4] The Court **DENIES without prejudice** Defendants' motion to strike Gray and Hill-O'Neill as witnesses. Under Fed. R. Civ. P. 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Defendants correctly note that a failure to make a required disclosure can (among other remedies) result in exclusion of testimony. *Adkins v. TFI Family Svcs.*, No. 13-2579-DDC-GLR, 2017 WL 3130587, *2 (D. Kan. July 24, 2017). However, *Adkins* explicitly noted that exclusion was a "drastic sanction." *Id.*

In determining whether to grant relief, the Court considers "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability to cure any prejudice; (3) the potential for trial disruption if the testimony is allowed; and (4) the erring party's bad faith or willfulness." *Id.* at *4 (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002)). In the present case, Defendants make no claim that Plaintiffs acted in bad faith. (Doc. 137, at 26.) The discovery deadline has been extended to August 27, 2021, and prejudice to plaintiffs may be substantially reduced or eliminated by timely compliance with

---

[4] *See* Doc. 137, at 8-14.

the order to compel.  Whether to impose the drastic sanction of exclusion is committed to the discretion of the court.  *Adkins*, 2017 WL 3130587, at *4.  The Court in its discretion finds that exclusion is not required at the present time.

**2.      Motion to Supplement (Doc. 151).**

Plaintiffs contend that during the meet and confer process, they became aware of two issues related to the expert designations, including several typographical errors contained in Gray's written report, and that the "defendants sought to discredit – and or deny – the authenticity and accuracy of the RUG data they submitted to CMS under penalty of perjury."  (Doc. 151, at 5-6.)  Plaintiffs have moved for permission to amend Gray's written report to correct typographical errors in two paragraphs and to add a paragraph analyzing RUG data.  (Doc. 151, at 2.)  Gray's report would thus be amended to state:

> [D]aily RUG scores as provided by CMS for the period of August 1 – 28, 2018, indicates a time study staffing estimate of 3.71 HPPD or 3 hours and 42.6 minutes per patient per day. The daily RUG scores produced by the defense indicates a time study staffing estimate of 3.68 HPPD or 3 hours and 40.8 minutes per patient per day. The difference between the CMS data and defense data is 1.8 minutes per patient per day. This is one eight-thousandths of one percent difference and is immaterial.

Defendants deny that they are contesting the accuracy of what they submitted to CMS, but instead are attempting to discover how Gray processed the nationwide data she received from CMS to reach her Time Staffing conclusions.

13

Defendants do not contest the typographical changes, but argue that Plaintiffs' substantive changes would disregard the Scheduling Order in this case and circumvent Fed.R.Civ.P. 26(a) and (e) by untimely amending Gray's report with new opinion and analysis. (Doc. 154, at 7-8.)

Defendants prepared a Case Mix Detail Reports from its PointClickCare medical records system. These Reports were not submitted to CMS, but were directly given to Plaintiffs on October 13, 2020. Accordingly, Defendants argue, the "supplementation" now sought by Plaintiffs is simply at attempt by Gray to buttress her conclusions by referencing material which was in Plaintiffs' possession for three months before Gray's report was due.

Defendants cite ***Spirit Aerosystems v. SPS Tech.***, No. 09-1144-EFM-KGG, 2013 WL 6196314, *7-8 (D. Kan. Nov. 27, 2013), where the court observed:

> Under Rule 26(e), a supplemental report is allowed when a party or expert learns that the original report is incomplete or incorrect in some material respect. Specifically, that means a supplemental report may correct inaccuracies or fill in the blanks of an incomplete report based on information that was not available at the time of the original report. But a lack of diligence in pursuing information that could have been available at the time of the original report does not mean the same as information that was not available. Rule 26(e) does not allow a party to submit an amended or rebuttal report not based on new information. Allowable 'new information' does not include a response to another expert's report in a supplemental report if the information was available when the original report was due.

14

(Citations omitted).

The Court agrees that the requested supplementation reflects a failure to comply with Rule 26, which requires that expert reports "contain a complete statement of all opinions to be expressed." The supplemental opinion rests on information available to Plaintiffs well before Gray's report, and appears to be a response to a legal argument advanced by Defendants in connection with the motion to compel.

"A supplemental expert report may be excluded under Rule 37(c) if it states an additional opinion or seeks to strengthen an opinion expressed in the original report. ***Spirit Aerosystems***, 2013 WL 6196314, at *7. In their Reply (Doc. 157), Plaintiffs do not contend they complied with Rule 26. Rather, Plaintiffs focus on Rule 37, arguing that exclusion is unwarranted in the present case.

Although it is something of a close question, applying the Rule 37 standards set forth earlier with respect to Defendant's motion to strike, the Court finds exclusion is not just justified. There is no indication of bad faith, or (given the several extensions in the schedule) of incurable injury to Defendants.

This conclusion, however, contemplates curative action by Plaintiffs by compliance with Rule 26 for the provision of all data relied upon by Gray in submitting her supplemental opinion. That is, as with her initial report, Plaintiffs are obliged by Rule 26 to produce the methodology, codes, coding, or other

formula by which Gray achieved her results; in this case, how she converted the Case Mix Detail Reports into her eventual "staffing study estimate." The Court therefore provisionally grants Plaintiff's motion, upon the condition of such prompt and timely production.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Compel or Strike (Doc. 137) is **GRANTED in part** as to the request to compel and **DENIED in part, without prejudice**, as to the request to strike as provided herein. Plaintiffs' Motion to Supplement (Doc. 151) is **GRANTED** upon the condition of such prompt and timely production as directed herein.

**IT IS SO ORDERED.**

Dated this 14th day of June, 2021, at Wichita, Kansas.

                                     S/ KENNETH G. GALE
                                     HON. KENNETH G. GALE
                                     U.S. MAGISTRATE JUDGE