IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CHARLES MURRAY, Individually, and as Special Administrator of the estate of Lula Robertson,

Plaintiff,

v.

MANORCARE OF TOPEKA KS, LLC,

Defendant.

Case No. 2:19-cv-02148-HLT

**ORDER**

This is a malpractice action arising out of the death of a nursing home resident. The case is brought by the administrator of the resident's estate against the nursing home and other related entities.[1] Plaintiff alleges negligence related to a choking incident that led to Lula Robertson's death as well as negligence related to understaffing. Currently before the Court are two motions by Defendants to exclude certain expert opinions designated by Plaintiff. Docs. 206 and 208. Relevant here, the experts have offered opinions regarding the staffing levels at the nursing home where Robertson lived.

As discussed below, the Court grants Defendants' motion to exclude the opinion of Kathleen Hill-O'Neill regarding staffing levels as measured against a 1995-1997 staff time measurement ("STM") study because Hill-O'Neill testified that neither the standard of care nor state or federal regulations require nursing homes to staff to STM levels, and her opinions on this issue are therefore not relevant. The Court also grants Defendants' motion to exclude the opinions

---

[1] Although Plaintiff sues on behalf of an estate and on his own behalf, the Court refers to him in the singular. Because there were multiple defendants at the time these motions were filed, the Court refers to Defendants in the plural.

of Valerie Gray in full because the purpose of Gray's report is to compare the staffing levels at Defendants' nursing home with STM staffing levels.

## I. BACKGROUND

Robertson became unresponsive on August 28, 2018, and was transferred from the nursing home where she lived to the hospital via ambulance. She died on August 30, 2018. Plaintiff claims that Robertson had a risk of aspirational pneumonia and required supervision during any oral intake. Doc. 212 at 2. At lunch on August 28, 2018, Robertson reported to the activity director that she had choked on noodles. *Id.* Around 5pm that same day, Robertson's blood sugar was 55. *Id.* Plaintiff claims that nursing staff gave Robertson watermelon to raise her blood sugar and that Robertson choked on the watermelon and went into cardiac arrest. *Id.* Plaintiff claims that Defendants negligently failed to notify Robertson's doctor about the choking incident at lunch and negligently gave her watermelon later that day to raise her blood sugar. *Id.* at 16.

Plaintiff also alleges that Defendants had a duty to provide a sufficient number of staff based on resident acuity rather than budget. *Id.* Because of insufficient staff, there were no trained nursing staff to observe Robertson's choking incident with the noodles, complete an assessment, notify her doctor, and recognize that a change in her plan of care was needed. *Id.* Plaintiff also argues that nursing staff wrongly gave Robertson watermelon to raise her blood sugar because there was only one nurse checking and documenting blood sugar for five to ten residents. *Id.*

Plaintiff has retained at least two experts. The first is Kathleen Hill-O'Neill, who is a Doctor of Nursing Practice, registered nurse, gerontological nurse, practitioner, and licensed nursing home administrator. Doc. 209-1 at 2. Hill-O'Neill opines that Defendants violated the standard of care by not conducting a comprehensive nursing assessment after Robertson choked

on noodles at lunch, and by providing her watermelon and orange juice[2] in response to low blood sugar. *Id.* at 4. Regarding the sufficiency of staffing, Hill-O'Neill states:

> The standard of care requires a skilled nursing facility: (1) to conduct a daily quantitative analysis of each resident's nursing needs, i.e., how many RNs, LPNs, and CNAs are needed on a daily basis to meet that resident's needs; and (2) then provide a sufficient number of RNs, LPNs, and CNAs to meet the needs of all the residents in the facility. The standard of care does not permit a skilled nursing facility to substitute LPNs for RNs.
>
> As a result, a skilled nursing facility – like Manorcare of Topeka – has two choices when complying with the standard of care regarding staffing. First, the nursing home can develop its own method of quantitatively analyzing and documenting the staffing needs of its resident population on a daily basis. The sufficiency of the nursing home's quantitative analysis can then be measured against the CMS Staff Time Measurement (STM) described below. Should the nursing home choose not to conduct this daily quantitative analysis then the standard of care requires that it utilize its residents' minimum data sets, resource utilization group (RUG) scores, and the results of CMS STM to determine the amount of nursing staff necessary to meet the residents' needs.

*Id.* at 6. Hill-O'Neill opines that Defendants violated the standard of care because they did not quantitatively analyze or document staffing needs based on daily resident population. Hill-O'Neill then relies on Valerie Gray's report to conclude that Defendants violated the standard of care by not providing sufficient staffing as measured against the STM study. *Id.* at 9.

Gray, another one of Plaintiff's experts, is a certified public accountant. Doc. 207-1 at 2. Plaintiff retained her to calculate "how the amount of nursing staff reported by Manorcare of Topeka—through various outlets—compares with the amount of nursing staff CMS determined, through the STM Study between 1995-1997, those residents needed on average." *Id.* According to Gray, the STM study determined the amount of nursing care needed for each Resource Utilization

---

[2] Whether Robertson was given watermelon or orange juice seems to be a factual dispute between the parties.

3

Group ("RUG").[3] Gray compared staffing levels at Defendants' facility and concluded that they fell below the staffing levels outlined in the STM study.[4] *See generally id.*

Gray is not a nurse or healthcare provider. She was only retained to compare actual staffing levels to STM staffing levels. Doc. 226 at 2. She does not offer any "opinions about the significance of the results of those mathematical conclusions." *Id.* Rather, Plaintiff uses Hill-O'Neill to draw conclusions from Gray's calculations. *Id.* In other words, Hill-O'Neill intends to testify about what the standard of care requires regarding staffing and then, using Gray's calculations, testify that Defendants failed to meet that standard.

Defendants move to exclude certain opinions of Hill-O'Neill regarding the sufficiency of staffing as compared to STM staffing levels, and Gray's opinions altogether.

## II.  STANDARD

Federal Rule of Evidence 702 imposes on the district court a "gatekeeping role" to ensure that expert testimony is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 597 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). In performing this gatekeeping function, the "the district court generally must first determine whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (quoting Fed. R. Evid. 702). Second, if the expert is qualified, the court determines if the expert's opinion is reliable. *Id.* The burden is on the party offering the expert testimony to prove its admissibility. *Id.*

---

[3]  A RUG score is measure of patient acuity obtained from assessments of patients at various intervals. *See* Doc. 226 at 2; Doc. 207 at 2.

[4]  Gray submitted a supplemental report. Doc. 169. But distinctions between the original and supplemental reports are not relevant for purposes of the *Daubert* motions.

### III.   ANALYSIS

#### A.   Kathleen Hill-O'Neill

Defendants argue that Hill-O'Neill "should be prohibited from testifying regarding any opinions, calculations, and testimony related to STM staffing levels being a measure for sufficiency of staff." Doc. 235 at 3. Defendants don't challenge Hill-O'Neill's qualifications to opine on nursing home staffing levels. But they argue that Hill-O'Neill's opinions about the sufficiency of staffing based on STM staffing levels will not assist the trier of fact because nursing homes are not required to meet STM staffing levels. Doc. 209 at 5.

Hill-O'Neill's report states that "the standard of care requires a skilled nursing facility: (1) to conduct a daily quantitative analysis of each resident's nursing needs . . . and (2) then provide a sufficient number of RNs, LPNs, and CNAs to meet the needs of all the residents in the facility." Doc. 209-1 at 6. She goes on to state that a nursing home could develop its own method of analyzing staffing needs and compare the results to the STM study but, if it does not develop its own method, "then the standard of care requires that it utilize its residents' minimum data sets, resource utilization group (RUG) scores, and the results of CMS STM to determine the amount of nursing staff necessary to meet the residents' needs." *Id.* at 6; *see also id.* at 7 n.3. Hill-O'Neill then concludes, based in part on Gray's mathematical analysis, that "Manorcare of Topeka failed to provide sufficient staff to meet the needs of its residents for the month of August 2018—and August 28, 2018 specifically." *Id.* at 9.

Defendants challenge this conclusion in various ways. But they primarily take issue with Hill-O'Neill using STM staffing levels as the benchmark by which staffing is measured. This is because Hill-O'Neill testified at her deposition that STM staffing levels are <u>not</u> the standard of care and nursing homes are <u>not</u> required to staff to STM levels under state or federal regulations.

5

*See* Doc. 209-2 at 18-19 (answering "No, no." when asked if nursing homes "should be staffed according to the STM model"). She testified:

> [W]hat they should have is some system, some specific system to analyze the acuity and the needs of their residents. That's what the standard of care is, that's what the requirement is. And if you don't have some system, you've got the STM model right there that is a good, reliable source.

*Id.*; *see also id.* at 50 ("The standard of care requires them again to have some system of identifying acuity and resident needs and having adequate staffing assuring that."). Hill-O'Neill also testified that staffing based on the STM study is not a federal regulatory requirement, and that no states require nursing homes to use the STM study to determine sufficient staffing. *Id.* at 45-46, 48. When asked if she thought that STM staffing levels should be the regulatory standard of care, she said, "Either that or something to that level that gives clear, specific guidelines for people who don't have their own tool or mechanism to calculate—assess acuity and calculate staffing accordingly based on patient needs." *Id.* at 49.

Given Hill-O'Neill's testimony that staffing to the level of the STM study is not the standard of care and is not required by regulations, Defendants argue that whether they met those levels is irrelevant to Plaintiff's claims. Doc. 209 at 6.[5] The Court agrees. The Court's gatekeeping role under Rule 702 requires that it determine that expert testimony is both reliable <u>and relevant</u>. *Daubert*, 509 U.S. at 597. "A trial court must look at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact." *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1234 (10th Cir.

---

[5] Defendants also argue that staffing levels are irrelevant to Plaintiff's allegations because the issue is whether staff properly responded to Robertson's low blood sugar and at least one nurse was with Robertson at all times after her low blood sugar was detected. Doc. 209 at 9. But this is essentially a merits argument on Plaintiff's staffing claim.

2005). No matter how scientifically valid an expert's proffered testimony is, it simply may not "fit" the case. *See id.*

Plaintiff alleges that Defendants violated their duty to provide sufficient nursing staff. *See* Doc. 212 at 15-21; *see also* PIK 123.01 (defining "duty of care" and stating that a violation of the duty is negligence). But Plaintiff's own standard-of-care expert has stated that staffing to STM levels is not the standard of care. Thus, whether Defendants' staffing levels were on par with STM staffing levels is not relevant to any claims in this case.

Nor would it be appropriate to allow Hill-O'Neill to testify on this issue just because Hill-O'Neill believes the STM study is a viable or preferable option for measuring staffing. *See Daubert*, 509 U.S. at 590 ("Similarly, the word 'knowledge' [in Rule 702] connotes more than subjective belief or unsupported speculation."); *cf. Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 658 (10th Cir. 2018) ("Opinion evidence need not be admitted when it is connected to existing data only by the *ipse dixit* of the expert." (internal quotation and citation omitted)).[6] Her opinion on this issue effectively is that staffing to STM levels is best practices. But that doesn't inform on the standard of care in this case. *See S. Minn. Beet Sugar Coop. v. Agri Sys.*, 2020 WL 5105763, at *5 (D. Minn. 2020) (finding that testimony on best practices "would not serve as evidence from which a jury could discern the industry standard of care"). Allowing Hill-O'Neill (and Gray) to offer their recommendation that STM staffing levels should be used could also unfairly prejudice Defendants by causing a jury to conclude that Defendants failed to meet a standard they are not required to meet. *See Daubert*, 509 U.S. at 595 (noting that courts should evaluate the admissibility of expert testimony in the context of Rule 403).

---

[6] The Court acknowledges that Hill-O'Neill relies on a 2020 article about the use of the STM study to set staffing levels ("Harrington article"). But the Harrington article only advocates the use of the STM study to increase staffing levels going forward. It does not state that nursing homes are required to meet that standard now (or were required to in 2018). *See generally* Doc. 226-1.

Defendants do not challenge Hill-O'Neill's opinion that the standard of care requires nursing homes to have some method of staffing according to patient needs. Thus, she is free to offer her expertise on that point. But it would be improper to allow her to testify about whether Defendants met STM staffing levels when even Hill-O'Neill concedes that neither the standard of care nor any state or federal regulations require as much.

### B.     Valerie Gray

Plaintiff concedes that Gray's expertise is purely mathematical, and that she only "opines that the staffing levels are either less, more, or the same as those contained in the CMS STM estimates of what was necessary." Doc. 226 at 2. Because Hill-O'Neill's opinions regarding STM staffing levels are excluded, Gray's opinions on this subject must likewise be excluded.

### IV.     CONCLUSION

THE COURT THEREFORE ORDERS that Defendants' Motion to Exclude Certain Opinions of Kathleen Hill-O'Neill (Doc. 208) is GRANTED. Hill-O'Neill's opinions regarding STM staffing levels are EXCLUDED.

THE COURT FURTHER ORDERS that Defendants' Motion to Exclude Opinions of Valerie Gray (Doc. 206) is GRANTED. Gray's opinions are EXCLUDED.

IT IS SO ORDERED.

Dated: December 20, 2022                    /s/ *Holly L. Teeter*
                                            HOLLY L. TEETER
                                            UNITED STATES DISTRICT JUDGE